IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| CLARENCE REDMOND LOGUE,<br><br>Plaintiff,<br><br>vs.<br><br>JENNIFER ROOT; C.D.O. COOPER;<br>and TAMMY BOWEN,<br><br>Defendants. | Cause No. CV 19-101-M-BMM-JTJ<br><br><br>ORDER and FINDINGS AND<br>RECOMMENDATION<br>OF U.S. MAGISTRATE JUDGE |

Plaintiff Logue filed this action on June 13, 2019.  He alleges the Defendants unlawfully took funds from his jail trust account to reimburse Flathead County for medical expenses it paid for Logue during a previous stay in jail.  *See* Compl. (Doc. 2) at 5; Supp. (Doc. 2-1) at 1; Statement of Facts (Doc. 2-3) at 5–6.

Each party has moved for summary judgment, and other motions are pending as well.  All are addressed here.

## I.  Surplus Allegations

Before turning to the motions for summary judgment, the Court will clarify what is not happening in this action.

In multiple rulings by Judge Lynch, this Court, and District Judge Morris, Logue has been advised that only one claim is at issue:  his claim to relief under 42 U.S.C. § 1983 because Defendants violated his Fourteenth Amendment right to

1

procedural due process by taking money from his inmate trust account.

The Court will disregard Logue's theories that Defendants (and others) are responsible for damages or injuries he suffered as knock-on consequences of Defendants' alleged due process violation, such as revocation of his conditional release.  The constitutional right to procedural due process protects the plaintiff's right to *procedure*, not to the property taken.  Even if Logue prevails, damages caused by loss of the *property* are not available.  *See Carey v. Piphus*, 435 U.S. 247, 263–64 (1978).  To the extent Logue's motion to stay (Doc. 143) argues otherwise, it is denied.

Finally, the Court does not recognize any viable state-law claims in Logue's pleadings.  If state law claims do exist, they must be novel ones.  The Court will recommend declining supplemental jurisdiction.  *See* 28 U.S.C. § 1367(c)(1), (d).

## II.  Motions for Summary Judgment

### A.  Summary Judgment Standards

A party is entitled to summary judgment if "there is no genuine dispute as to any material fact" and it is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Material facts are facts that may affect the outcome of the case.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable juror to return a verdict in the non-moving party's favor.  *Id.*

2

The moving party has the initial burden to show the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If it meets this initial responsibility, the burden shifts to the non-moving party to establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the non-moving party must "go beyond the pleadings and by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

### B.  Undisputed Facts

The parties dispute some facts, but they agree on the following.

Two Montana statutes are central to the case. Inmates in county detention centers are responsible for actual medical costs "associated with . . . preexisting conditions." Mont. Code Ann. § 7-32-2245(2)(a). Counties or arresting agencies are responsible for "medical costs associated with . . . medical conditions that are not preexisting." Mont. Code Ann. § 7-32-2224(2)(a). Other qualifications apply, and the law clarifies that emergency services must not be denied based on an inmate's inability to pay. But these two provisions are the only ones relevant here.

Logue was arrested and detained at the Flathead County Detention Center ("FCDC") on two occasions in 2017. Each time, he received a copy of the inmate

rule book.  *See* First Grande Aff. (Doc. 67) at 3 ¶ 13.  Under the heading "Medical and Dental," the book advised him that care would be available "by requesting a 'sick call slip'" and that sick call was "routinely done Monday, Wednesday, and Fridays."  The book also said that inmates "will be charged for services at the rates listed on the 'Sick Call Slip'."  Inmate Rule Book (Doc. 67-5) at 3.

Logue's first period of detention at FCDC began on June 11, 2017.  No one has suggested he was experiencing pain before he was arrested.  FCDC Corporal Schaible reported that, midmorning on June 12, a Monday, *see* Fed. R. Evid. 201, Logue complained that "his liver was hurting" and said he had been to the hospital in the past for "liver failure."  *See* Schaible Report (Doc. 67-1) at 2.  Logue also said "he needed his meds which were in his car."  *Id.*  Corporal Schaible noted that Logue's pulse was elevated but other vital signs "seemed to be in the normal range."  *Id.*  Corporal Schaible consulted a nurse at North Valley Hospital, and she suggested Logue should come in for a medical evaluation.  Officer Wiersma transported Logue to the emergency room, where he was seen and "cleared" for a return to jail a few hours later.  *See id*.

Neither party has claimed that Logue received a bill at this time for the hospital's services.  There is no evidence Logue asked to go to the hospital. Corporal Schaible, who reported the incident, did not say Logue used a "sick call slip."  *See* Schaible Report (Doc. 67-1) at 2.  The Defendants have not introduced

one or claimed that he did.  As there is no sick call slip, there is no evidence Logue knew he would or might have to pay for the hospital trip or what "rate" would apply.

When Logue returned to FCDC in October, he signed a form authorizing "the attending physician and medical staff to provide such services and treatment as deemed reasonable and necessary" and acknowledging that he "may be charged for services provided."  Receiving Screening Form (Doc. 67-2) at 2.  Commander Grande avers that Logue received and signed this form in June as well, but it is not in evidence.  Even if Logue signed the same form in June, however, the form does not say whether "*the* attending physician and medical staff" meant personnel consulted at FCDC or any medical providers wherever consulted.  The form does not mention hospital trips.[1]

The parties dispute whether Medicaid would have paid for Logue's care. This dispute is not material to the outcome.

On July 3, 2017, FCDC[2] paid North Valley Hospital $1,079.82.  *See* Defs. SUF (Doc. 100) at 3 ¶ 4; *see also* Hospital Statement (Doc. 50-1) at 6, 7;

---

[1]  Exhibit N to Logue's Affidavit in support of his motion for summary judgment is a page from a later version of the FCDC handbook, effective August 1, 2018.  It says an inmate is "responsible for the actual costs of your medication, medical services, or hospitalization while you are in the Detention Center," "per MCA 7-32-2245(2)."  Logue Aff. Ex. N (Doc. 50-14) at 1. Due to the effective date, this advisement is not relevant to the case.

[2]  Neither party clarifies which defendant, if any, actually performed or directed the acts most centrally at issue or who kept the accounts.  For brevity, the Court will refer to FCDC as if it acted for itself.

Commander Root (Grande) Letter Apr. 24, 2018 (Doc. 50-11) at 7.

Between June 11 and July 7, Logue accrued several charges for prescriptions and for sick call and commissary items, but the statement does not reflect any charge for services at North Valley Hospital.  The highest amount charged during this period is $34.61 on June 19, and it is described as a commissary purchase.  *See* Account Statement (Doc. 102-2) at 4–5.

On July 7, 2017, Logue was released from FCDC.  FCDC's statement of activity in Logue's inmate trust account shows that he owed FCDC $80.75 at this time.  *See id*. at 4.

Logue's second period of detention began on October 31, 2017.  Logue's account statement shows reinstatement of the previous balance owed, $80.75.  *See* Account Statement (Doc. 102-2) at 4.  As Logue obtained various medical or commissary items over the next month, the amount he owed increased bit by bit from October 31 until December 4, 2017.  On that date, he owed $174.10.  *See id*.

When an inmate has a negative account balance, FCDC applies 50% of any new deposits to the balance until the debt is discharged.  *See* First Grande Aff. (Doc. 67) at 2 ¶ 6.  Inmates can view their account statements at any time.  *See* Second Grande Aff. (Doc. 102) at 2 ¶ 7.

On December 5, 2017, Wells Fargo deposited $500.00 in Logue's inmate account.  The same day, each medical or prescription charge Logue incurred

6

between June 11 and December 4 was individually cleared from his inmate account.  *See* Account Statement (Doc. 102-2) at 3–4.  As of the last entry on December 5, 2017, Logue's balance was $325.90—that is, $500.00 minus the $174.10 Logue owed to FCDC.  *See id.* at 3.  Neither party suggests that Logue received notice of FCDC's intent to take $174.10 from his inmate account or an opportunity to be heard before FCDC took the money.

On December 26, 2017, Wells Fargo deposited $600.00 in Logue's account. *See* Account Statement (Doc. 102-2) at 3.  Because Logue's account did not have a negative balance, FCDC did not take any portion of that deposit.

On January 22, 2018, Wells Fargo deposited $600.00 and $500.00, for $1,100.00 total.  As of the last entry on that day, Logue's account balance was $1,238.47.  Over the next three days, Logue made a handful of purchases totaling less than $100.00.  *See id.* at 2.

On January 25, 2018, FCDC levied a charge against Logue's account for $1,079.82 and, in the next entry on the same day, cleared the charge by taking that sum out of Logue's account.  The charge is categorized as "Medical" and described as "6-12-17 NV ER" (presumably meaning "North Valley Emergency Room").  Neither party suggests that Logue received notice before January 25, 2018, that FCDC considered him to be in debt for the hospital trip on June 12.  At the end of the day on January 25, Logue had $82.68 in his account.  *See id.*

7

On January 26, 2018, Logue submitted a grievance.  He said:

> On 1/22/2018 I received $1,100 in two cashier's checks from my
> bank.  I ordered store and a $20 phone card.  My account balance was
> $1,238.47.  I did not owe this jail or medical any money.  Now my
> account balance is $82.68.  Someone took or, stole about $1,100.00 of
> my money.

Grievance (Doc. 67-4) at 2.[3]  The officer who denied his grievance explained:

> On 06-12-17 you were transported to NV hospital for your liver.  You
> stated to the officer on that date that you had been to the hospital
> before for liver failure.  The money was taken due to a trip to the ER.

*Id*.

> In his appeal—still on January 26—Logue said:

> If I owed money, why was I not told, or given any papers on what I
> owed.  I am disabled and was released prior to that hospital visit[4] and
> I want my money returned now.  Someone needs to talk to me.  I was
> not taken to hospital in an ambulance nor were any tests done.  And I
> am very upset my money has been stolen.  I have had money
> deposited twice prior to this even and NO money was taken out for
> this bogus, make-believe bill.  I demand to see all documents that
> show I owe for this bill and to speak to shift sgt. . . . .

Grievance (Doc. 67-4) at 2.

> Still on January 26, an officer responded:

> You were received into Detention on 6/11/17 and then released on
> 7/7/17.  You were not released prior to that hospital visit.  It is my
> understanding the the [sic] Nurse has provided you with a copy of the
> bill to review.  I spoke to you outside of your housing unit and you

---

[3]  In this and the following quotations from the grievance forms, the Court alters some of
the capitalization to improve readability.

[4]  This statement was incorrect, but Logue is talking about something that happened more
than six months earlier.

> also spoke in booking to the shift Sgt regarding this matter as well.
> Your inmate account is current and reflects the amount remaining
> after this bill was paid from funds that were currently in your account.

Grievance (Doc. 67-4) at 3.

When Logue was released on February 6, 2018, he received all the money in his inmate trust account—$32.56.  *See* Account Statement (Doc. 102-2) at 2.

### C.  Analysis

Logue complains of a lack of due process on each occasion FCDC took money from his account:  $174.10 on December 5, 2017, and $1,079.82 on January 25, 2018.

#### 1.  Due Process Violation

"No State shall . . . deprive any person of . . . property, without due process of law."  U.S. Const. amend. XIV, § 1.  "A procedural due process claim has two distinct elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections."  *Brewster v. Bd. of Educ.*, 149 F.3d 971, 982 (9th Cir. 1998).

##### a.  Was Logue Deprived of a Protected Property Interest?

"There is no question that an inmate's interest in the funds in his prison account is a protected property interest."  *Shinault v. Hawks*, 782 F.3d 1053, 1057 (9th Cir. 2015)[5] (quoting *Quick v. Jones*, 754 F.2d 1521, 1523 (9th Cir. 1985))

---

[5]  The *Shinault* court points to Montana—specifically, Mont. Code Ann. § 7-32-2245—as

(internal brackets omitted).  Like Shinault's funds, the money in Logue's trust account falls within the scope of the Fourteenth Amendment's protection against arbitrary government action.  The Due Process Clause applies.

Defendants argue that Logue has no valid claim because they did not need a court order to charge him for medical visits.  This argument conflates two issues: whether inmates may be liable for medical costs, and when and how FCDC may take an inmate's money to pay those costs.  Logue does not claim that making inmates liable for medical costs violates the federal Constitution.  He claims he was "[d]eprived of property without due process of law."  Compl. (Doc. 1) at 7 (lines 3–22); *see also* Pl. Br. in Supp. (Doc. 49) at 2 (lines 1–3).

### b.  Did Defendants Give Logue Due Process?

The next question asks what process was due to Logue and whether the process he received was consistent with what was due.

"[T]o determine whether a pre-deprivation hearing is required and what specific procedures must be employed at that hearing given the particularities of the deprivation," *Shinault*, 782 F.3d at 1057, the *Shinault* court applied the three-

---

evidence that it is not "administratively burdensome" for States to provide notice and an opportunity to be heard before disposing of inmates' funds.  *See Shinault*, 782 F.3d at 1058–59 (citing *State v. Johnson*, 14 P.3d 480, 485 (Mont. 2000)).  The opinion describes Montana's statute as "plac[ing] the authority to collect incarceration costs with the sentencing court." *Shinault*, 782 F.3d at 1058.  This description is a reasonable interpretation of the statute.  But it is also dicta.  Nothing in the Court's analysis or reliance on *Shinault* as circuit precedent follows or depends on the panel's understanding of the Montana statute.

part balancing test of *Mathews v. Eldridge*, 424 U.S. 319 (1976).  It considered (a) the private interest affected; (b) the risk of erroneous deprivation through the procedures used and the value of additional safeguards; and (c) the government's interest, including the burdens of additional procedural requirements.  *See Mathews*, 424 U.S. at 335.

### (i)  Private Interest Affected

Defendants took $174.10 from Logue's trust account on December 5, 2017, and $1,079.82 on January 25, 2018.  In *Quick v. Jones*, 754 F.2d 1521, 1523 (9th Cir. 1985), the court found that $66.00 was substantial.  *Quick* is controlling authority.  Logue had a substantial interest in each sum of money taken from him. This factor weighs in Logue's favor.

### (ii)  Risk of Error and Value of Other Safeguards

FCDC's first deduction, on December 5, 2017, was consistent with ordinary accounting practice.  From June to December, FCDC entered each purchase Logue made against his inmate account.  When, on December 5, 2017, FCDC deducted $174.10 of Logue's $500.00 deposit to cover the amount he owed, it did so in the same step-by-step fashion.  *Compare* Account Statement (Doc. 102-2) at 4–5 (transactions from 6/11/2017 through 10/31/2017) *with id.* at 3–4 (transactions on 12/5/2017).  FCDC also took less than 50% of Logue's $500.00 deposit, consistent with its policy.  *See* First Grande Aff. (Doc. 67) at 2 ¶ 6.  And Logue could have

11

viewed his account statement at any time.  *See* Second Grande Aff. (Doc. 102) at 2
¶ 7.  As to this transaction, there was little risk of error, and additional safeguards
would have added little to the reliability of the taking.  Any errors in ordinary
accounting for inmate trust funds can be adequately dealt with via post-deprivation
grievance process.[6]  *See* Defs. Resp. Br. (Doc. 65) at 16; Defs. Br. in Supp. (Doc.
101) at 28; *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 19 (1978)
(quoting *Ingraham v. Wright*, 430 U.S. 651, 680 (1977)) (internal citation and
quotation marks omitted).

The transaction on January 25, 2018, is entirely different.  No June hospital
debt appeared on Logue's account at all until January 25, 2018.  *See* Account
Statement at 3–5 (transactions from 6/11/2017 through 1/25/2018).  On that day,
FCDC created the debt, labeled it as acquired the previous June, and executed on
it, all in one fell swoop—$1,079.82 charged, and $1,079.82 paid.  *See* Account
Statement at 2 (second and third transaction on 1/25/2018).  This approach
provided zero notice to Logue that FCDC viewed him as having a debt, much less
that money he received would be seized to pay it.  This approach obviously carried

---

[6]  Generally, "due process of law requires an opportunity for some kind of
hearing *prior to* the deprivation of a significant property interest."  *Memphis Light*, 436 U.S. at
19 (internal citation and quotation marks omitted) (emphasis added).  Defendants do not display
an awareness of the general rule.  It is clearly established in the Supreme Court's decisions and
was clearly established in the context of inmate trust accounts by, at the least, the Ninth Circuit's
2015 decision in *Shinault*.  *See, e.g.*, *Shinault*, 782 F.3d at 1058 (quoting *Zinermon v. Burch*, 494
U.S. 113, 127 (1990)).

a significant risk of error.  Since someone just up and decided Logue owed a debt, without even telling him there might be an issue, the *Memphis Light* exception permitting post-deprivation process does not apply.  As there were *no* safeguards, the value of *any* safeguard was correspondingly high.

The second factor weighs in Defendants' favor as to the December 5 deprivation and in Logue's favor as to the January 25 deprivation.

### (iii)  *Government Interest and Burden of Additional Procedure*

FCDC's interest in obtaining reimbursement for medical and other costs from inmates who have funds available for that purpose is certainly substantial—dollar for dollar as substantial as inmates' interest in the money in their trust accounts.  But FCDC has no legitimate interest in abandoning ordinary accounting for inmate trust funds.  Nor can FCDC claim that accounting for inmate funds is burdensome.  It does it all the time.  It fully accounted for Logue's debts and its deductions on December 5, so as to that transaction, this factor weighs in Defendants' favor.  This factor favors Logue as to the January 25 deprivation.

### (iv)  *Balancing the* <u>*Mathews*</u> *Factors*

The *Mathews* factors favor Defendants as to their taking of $174.10 on December 5, 2017.  Logue's account statement itself provided him notice of his debt, and he does not claim FCDC failed to communicate its policy of applying 50% of any deposits to outstanding negative balances.  Additional pre-deprivation

13

notice or a hearing would serve no useful purpose.  When Defendants use ordinary accounting practices, the post-deprivation process of FCDC's grievance system satisfies the Due Process Clause.

The factors favor Logue as to the January 25 taking of $1,079.82.  FCDC's accounting actually told Logue he was *not* responsible for the hospital trip.  FCDC gave Logue *no* process when it suddenly decided to charge him for the trip and seize his money to pay for it, so it certainly failed to give him *due* process.

### c.  Conclusion:  Due Process Violation

Defendants did not violate Logue's federal constitutional right to due process by taking $174.10 from his inmate trust account on December 5, 2017.  Defendants' motion for summary judgment should be granted as to the transaction on December 5, 2017.

### 2.  Lack of Injury

Defendants argue that Logue was not injured by any due process violation because the result would have been the same if he had received pre-deprivation process.  *See* Defs. Br. in Supp. (Doc. 101) at 19–21.  They might be right about the result.  They are wrong about the injury.

"[A] purpose of procedural due process is to convey to the individual a feeling that the government has dealt with him fairly."  *Carey v. Piphus*, 435 U.S. 247, 262 (1978).  Or, even better, to *actually* deal with him fairly.  Defendants say

that Logue has never explained why he did not owe the money, but "the right to due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions." *Carey*, 435 U.S. at 266. By just "up and deciding" Logue owed a debt and taking his money, Defendants created exactly the sense of being cheated that the Due Process Clause is designed to prevent. *See* Grievances (Doc. 67-4 at 2); *Carey*, 435 U.S. at 263–64 & n.20. It is not at all surprising that Logue's post-deprivation grievances focused on why the Defendants did what they did.

Logue was injured in another way as well. As Defendants say, "[i]t is not necessary or required for an inmate to deposit amounts in his or her Keefe account." Defs. Resp. Br. (Doc. 65) at 8. A millionaire detained at FCDC may choose to maintain a zero balance in his inmate trust account. If Logue had received notice of his hospital debt in the same way he received notice of all his other debts, he might not have had Wells Fargo deposit so much money in his account.

Defendants' violation of Logue's right to due process was not harmless.

### 3.  Qualified Immunity

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). Numerous open legal questions exist. Does

15

Montana law allow a detention center administrator to decide whether an inmate's medical condition was "preexisting"?  If so, may the administrator seize funds from an inmate trust account to pay the debt?  *See* Mont. Code Ann. §§ 7-32-2224(2)(a), (4), -2245(2)(a).  If so, what type of notice must the inmate receive?  And who hears the inmate's case?  But these questions do not arise here.

Defendants fail to lay adequate *factual* foundation for their claim to qualified immunity.  Using ordinary, humdrum accounting principles, FCDC contemporaneously itemized every single charge to Logue's account between June 11, 2017, and July 7, 2017—including medical expenditures—and every single charge to Logue's account between October 31, 2017, and February 6, 2018.

Every single charge, that is, *except* the cost of the trip to the North Valley emergency room on June 12, 2017.  Defendants cannot argue in good faith (and in fact they don't argue) that they belatedly realized Logue was able to pay for the hospital trip.  FCDC charged *all* items to Logue's account, regardless of whether he had funds in the account or not.  And FCDC kept track of negative balances, reinstating them when previously released indebted inmates returned to its custody.

The incident report supporting the finding of "preexisting condition" is dated June 12, 2017.  Defendants fail to explain why they did not charge Logue for the hospital trip in June, or when they paid for it in mid-July.

Similarly, Defendants fail to explain why they seized over 98% of the

16

$1,100.00 deposited to Logue's account on January 22.  Their own policy said they would take 50% of incoming funds to satisfy debt.  *See* First Grande Aff. (Doc. 67) at 2 ¶ 6; Account Statement (Doc. 67-2) at 2.

Although Defendants fail to explain their actions, the record does contain a telling statement.  Commander Grande's second affidavit asserts that Logue could "drain his . . . account" by transferring "amounts" of money out to "friends or relatives."  Second Grande Aff. (Doc. 100) at 6 ¶ 14.  Even if he could, that would not change the fact that the funds in the account belonged to him.  But Defendants' own exhibits demonstrate that this fear was unfounded.  FCDC manages the trust account funds.  It enforces the rules.  The rules said Logue could only use the funds in his account for commissary or other items within FCDC, *see* Defs. Resp. (Doc. 65) at 8–9, and "[m]oney may be released one time," Inmate Rule Book, Defs. Ex. E (Doc. 67-5) at 7; First Grande Aff. (Doc. 67) at 3 ¶ 13.  Commander Grande's statement seems to suggest Defendants feared notifying Logue of his debt would prevent them from taking his money.  That is not a legally supportable reason to withhold notice.

Defendants fail to show a reason for waiting seven and a half months to charge Logue for the hospital visit.  They fail to show a reason for seizing over 98% of his incoming deposit to pay that charge.  Their manner of assessing the debt directly contradicted their contemporaneous tracking of Logue's inmate trust

17

account as to all other debits and credits and their own purported rules. They do not suggest any of these acts or omissions was connected with an open legal question. They are not entitled to qualified immunity.[7]

---

[7] Defendants point to cases authorizing jails or prisons to collect fees or co-payments for medical services. Logue does not claim he cannot be charged for medical care. At any rate, in each case Defendants cite, either the inmate received notice of the specific amount to be charged to his account *before* he saw a medical provider, or the inmate was required to sign a paper acknowledging his obligation to pay for a specific medical consultation *before* he received it. *See Sickles v. Campbell County*, 501 F.3d 726, 730, 731 (6th Cir. 2007); *Scott v. Angelone*, 771 F. Supp. 1064, 1067 (D. Nev. 1991), *aff'd*, 980 F.2d 738 (9th Cir. 1992), *cited in* Defs. Resp. Br. (Doc. 65) at 10; Defs. Br. in Supp. at 15–16; *Gardner v. Wilson*, 959 F. Supp. 1224, 1229 (C.D. Cal. 1997), *cited in* Defs. Resp. Br. at 10–11; Defs. Br. in Supp. at 16; *Myers v. Klevenhagen*, 97 F.3d 91, 92–93, 95–96 (5th Cir. 1996) (per curiam), Defs. Resp. Br. at 11; Defs. Br. in Supp. at 16; *McCabe v. Pennsylvania Dep't of Corr.*, 523 Fed. Appx. 858, 859, 861 (3d Cir. 2013) (per curiam), *cited* in Defs. Resp. Br. (Doc. 65) at 11; Defs. Br. in Supp. at 16. Here, Defendants point to no evidence Logue acknowledged or even was advised of his responsibility to pay for the hospital visit before he went.

Defendants also cite *Botelho v. Wall*, No. CA 05-338S, 2006 WL 760596 (D.R.I. Feb. 16, 2006), *cited in* Defs. Resp. Br. (Doc. 65) at 11; Defs. Br. in Supp. at 16–17; *Pruett v. Burnett*, No. 6:10cv84 (E.D. Tex. Apr. 5, 2010), *cited in* Defs. Resp. Br. at 12; Defs. Br. in Supp. at 17; and *Lewis v. Holloway*, No. 5:17-CV-5099 (W.D. Ark. Aug. 11, 2017), *cited in* Defs. Resp. Br. at 12; Defs. Br. in Supp. at 17. Each concerns an inmate's complaint that he cannot be held responsible for medical costs (that is, co-payments or flat fees). It is not clear whether the inmate in *Clayton v. Ozmint*, 2:10-cv-190-RBH, 2010 WL 5798740 at *3 n.3 (D.S.C. Dec. 7, 2010), *cited in* Defs. Resp. Br. at 12; Defs. Br. in Supp. at 13–14, complained about the co-payment or instead claimed he was deprived of due process, but the cases cited by the court, *Cabbagestalk v. Richstad*, No. CV 3:09-1384, 2009 WL 4040479 at *9 (D.S.C. Nov. 19, 2009), and *In re DNA Ex Post Facto Issues*, 561 F.3d 294, 299–300 (4th Cir. 2009), *cited in Clayton*, 2010 WL 5798740 at *3 n.3, suggest the former. All these cases are inapposite. Once again, Logue does not say it is unconstitutional to charge him for *any* medical cost. He accuses Defendants of taking his money without due process.

In *Bihms v. Klevenhagen*, 928 F. Supp. 717 (S.D. Tex. 1996), *cited in* Defs. Resp. Br. (Doc. 65) at 11; Defs. Br. in Supp. at 16, the inmate—unlike Logue, a convicted and sentenced felon awaiting transport to state prison—"object[ed] to paying for his medical care while in the custody of the State." *Id.* at 718. As he required dialysis and medicine on a continuing basis, the county deducted a total of $594.00 from his inmate account. The court took it for granted that the defendants used ordinary accounting practices: "[T]he inmate may not know the amount of his bill at the jail's medical unit," but "will know to look for a deduction in the sixty days or so after treatment." *Bihms*, 928 F. Supp. at 718.

These cases do not resemble FCDC's departure from the accounting it meticulously provided for each debit and credit, including medical charges, *except* Logue's hospital debt.

**D.  42 U.S.C. § 1985**

Logue claims he is entitled to judgment under 42 U.S.C. § 1985, *see* Pl. Br. in Supp. (Doc. 49) at 4, because his funds were social security disability payments. A jail may not take certain federal funds, including social security, to pay costs of housing or providing care for an inmate.  *See, e.g.*, *Bennett v. Arkansas*, 485 U.S. 395, 397–98 (1988) (per curiam); *Nelson v. Heiss*, 271 F.3d 891, 895–96 (9th Cir. 2001); *Brinkman v. Rahm*, 878 F.2d 263, 264–65, 265–66 (9th Cir. 1988) (per curiam); *Hawes v. Stephens*, No. 6:16cv442, 2017 WL 3634188 at *5, *6 (E.D. Tex. July 13, 2017) (Report and Recommendation adopted Aug. 22, 2017).

But only funds placed in an account by direct deposit from the federal government are protected.  *See* 31 C.F.R. part 212 (May 1, 2011).  Assuming Logue's funds at Wells Fargo were social security disability payments—a point on which the Court does not believe it has seen any evidence—Logue's decision to transfer those funds to his inmate trust account vitiated their protection.  And none of this appears to have any bearing on 42 U.S.C. § 1985.  Special federal assistance in protecting SSDI payments is not the same thing as special federal assistance in protecting civil rights, *see, e.g.*, *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1536 (citation and internal quotation marks omitted), and Logue offers no reason to believe his money was taken *because* it was social security money or *because* Logue was disabled.  Defendants are entitled to summary judgment on this claim.

19

### E.  Conclusion:  Motions for Summary Judgment

Defendants are entitled to summary judgment as to 42 U.S.C. § 1985 and as to the transaction on December 5, 2017, because they did not violate Logue's right to due process by deducting $174.10 from Logue's account on that day.

Logue is entitled to summary judgment as to the transaction on January 25, 2018, because Defendants violated his Fourteenth Amendment right to procedural due process by taking $1,079.82 from his account on that day, and they are not entitled to qualified immunity.

### III.  Motions re: Additional Briefs or Materials

The Court has no need for additional briefing.  Defendants' motion to strike (Doc. 113) will be granted and Logue's unauthorized brief in support of his unauthorized supplemental pleading (Doc. 111) will be stricken.  Logue's motion to file a surreply (Doc. 122) will be denied.  Logue's motions to admit evidence and motion for subpoena, with their attached exhibits (Docs. 124, 149, 150), will be denied as they are not relevant to the motions for summary judgment.  If a subpoena is necessary, the Court will address that after the District Court acts on this Findings and Recommendation.

Logue's pretrial motion for relief (Doc. 129) is yet another brief in support of the complaint or possibly his motion for summary judgment.  It is denied and stricken and will not be further considered.

## IV.  Motion for Extension and for Counsel

On February 28, 2020, Logue moved for an additional 60 days to conduct discovery and to file pretrial motions and supporting briefs.  Discovery closed on February 18, 2020.  *See* Order and Scheduling Order (Doc. 36) at 10 ¶ 3.  The motion to extend discovery is denied as untimely.

After the District Court has acted on this Findings and Recommendation, the Court will revisit the schedule and issue another order.  At this time, Logue's motion to extend the deadline for pretrial motions and briefs is denied.

Logue has persuaded this Court he is entitled to summary judgment.  He does not need the assistance of counsel at this time.  His motion (Doc. 126) will be denied.

## V.  Defendants' Motions in Limine and for Judicial Notice

Defendants filed timely motions in limine (Doc. 134) and for judicial notice (Doc. 136).

The Court's explanation of what is not at issue in this case, *see* Part I, *supra*, addresses Logue's most recent motion, seeking leave to file yet another statement (Doc. 153), and also addresses Defendants' motion for judicial notice and topics A and B of Defendants' motion in limine.  Defendants' arguments are correct.

Defendants also ask the Court to preclude Logue from discussing or introducing evidence about deductions from other inmates' trust accounts and

21

about his arrest in June and/or October 2017.  Any such evidence is irrelevant because it would not make any fact at issue more or less likely to be true.  *See* Fed. R. Evid. 401(a), (b).  The motion in limine as to topics C and D will be granted.

As the last topic, E, Defendants assert that Logue may attempt to introduce evidence concerning medical malpractice claims or medical findings that are not at issue in the case and/or for which he lacks supporting expert testimony.  *See* Defs. Br. in Supp. of Mot. in Limine (Doc. 135) at 11–16.  Logue is entitled to compensatory damages if he can "convince the trier of fact that he actually suffered distress because of the denial of procedural due process itself" rather than because of the loss of his property.  *Carey*, 435 U.S. at 263–64.  Logue has not identified or disclosed an expert witness, with or without a report,[8] but no trial date has been set and the scheduling order (Doc. 36) did not set a deadline for expert disclosures.  *See* Fed. R. Civ. P. 26(a)(2)(D).  Defendants' motion in limine will be granted as to any allegations of medical malpractice or lack of medical care or prescriptions.  As to expert disclosures that might be relevant to damages, however, the Court will revisit the issue after the District Court has acted on this Findings and Recommendation.

## VI.  Logue's Motion to Stay and Objection

---

[8] Logue named a vascular and endovascular surgeon in a supplemental disclosure filed after the close of discovery.  *See* Mot. to Admit Evid. (Doc. 124) at 1–2.  He does not explain the role of this person.

In the hailstorm of motions, one was previously overlooked.  Logue objected to Judge Lynch's Superseding Findings and Recommendation of July 17, 2019 (Doc. 21), and asked to stay this action pending decision of Logue's petition for writ of habeas corpus.  *See* Mot. to Stay and Objection (Doc. 22).  District Judge Morris's Order of March 2 does not address the motion, but it renders the motion moot.

In addition, the motion is meritless.  Logue attempts to elude the bright-line rule of *Polk County v. Dodson*, 454 U.S. 312 (1981), by explaining that he wants to sue his public defenders under § 1983 for aiding and abetting or being accessories to other state actors' commission of a tort or for failing to take action that would have prevented them from doing so.  *See* Mot. (Doc. 22) at 5.  Regardless of whether Logue's public defenders acted on his behalf or instead betrayed their obligation to act on his behalf, they did not act or fail to act "under color" of state law.  *See Polk County*, 454 U.S. at 324–25.

## VII.  Case Caption and Motion for Reconsideration

Finally, Logue has at various times added parties to the captions of his submissions.  Defendants Fisher and Buckley were named as defendants in the original complaint.  Judge Lynch recommended their dismissal on July 17, 2019, and Judge Morris dismissed them on March 2, 2020.  *See* Findings and Recommendation (Doc. 21) at 7 ¶ 2; Order (Doc. 127) at 8.

23

Logue has not named Flathead County as a defendant in an approved amendment, and he has never made allegations supporting an inference that Flathead County has a policy, custom, or practice that would make it liable under 42 U.S.C. § 1983 for depriving Logue of his Fourteenth Amendment right to procedural due process.  The deadline for amending the pleadings expired long ago.  *See* Scheduling Order (Doc. 36) at 9 ¶ 1.  Logue's argument in support of reconsideration draws on a *respondeat superior* argument and on a "policy" with an August 2018 effective date, several months after Logue's final release from FCDC.  *See* Br. in Supp. of Mot. for Reconsideration (Doc. 144) at 3–4.  The only three Defendants involved in this case are the three named in the caption of this document.

Based on the foregoing, the Court enters the following:

## ORDER

1.  Logue's motion to object and to stay (Doc. 22) is **DENIED AS MOOT**.

2.  Defendants' motion to strike Logue's brief in support of his motion to supplement his pleading (Doc. 113) is **GRANTED**.  Logue's brief (Doc. 111) is **STRICKEN** and will not be considered.

3.  Logue's motion (Doc. 122) for leave to file a brief in response to Defendants' reply brief in support of their motion for summary judgment is **DENIED**.

4.  Logue's motions to admit evidence and for subpoena (Docs. 124, 149, 150) are **DENIED**.

5.  Logue's motion to extend the deadlines for discovery and pretrial motions (Doc. 125) is **DENIED**.

6.  Logue's motions for the appointment of counsel (Docs. 126, 143) are **DENIED**.

7.  Logue's motion for pretrial relief (Doc. 128) is **DENIED** and **STRICKEN** and will not be considered.

8.  Logue's motion for leave to file statement (Doc. 153) is **DENIED**.

9.  Defendants' motion in limine (Doc. 134) is **GRANTED** as to Items A, B, C, and D.  The motion is also **GRANTED** as to Item E with respect to any allegations of medical malpractice or lack of medical care or prescriptions but **DENIED** as to potential expert disclosures or testimony relevant to compensatory damages resulting from the due process violation.

10.  Defendants' motion for judicial notice (Doc. 136) is **GRANTED**.  The Court takes judicial notice of the revocation proceedings in Flathead County Cause No. DC-15-2017-339-IN.

11.  Logue's motion to stay (Doc. 143) is **DENIED**.

12.  After the District Court has ruled on this Findings and Recommendation, and assuming its ruling does not result in entry of final

judgment, this Court will issue an order prescribing the next step in the litigation.

The Court also enters the following:

## RECOMMENDATION

1.  The District Court should **DECLINE** supplemental jurisdiction over any state-law claims.

2.  Logue's motion for summary judgment (Doc. 48) should be **GRANTED** as to the taking of $1,079.82 on January 25, 2018, and **DENIED** in all other respects.

3.  Defendants' second motion for summary judgment (Doc. 99) should be **GRANTED** as to the taking of $174.10 on December 5, 2017, and as to any claim under 42 U.S.C. § 1985 and **DENIED** in all other respects.

4.  Logue's motion (Doc. 143) for reconsideration of the Order of March 2, 2020, should be **DENIED**.

### NOTICE OF RIGHT TO OBJECT
### TO FINDINGS & RECOMMENDATION
### AND CONSEQUENCES OF FAILURE TO OBJECT

The parties may object to this Findings and Recommendation within 14 days. *See* 28 U.S.C. § 636(b)(1).[9]  Failure to timely file written objections may bar

---

[9] This deadline allows a party to act within 14 days after the Findings and Recommendation is "served." Federal Rule of Civil Procedure 6(d) allows three additional days after the period would otherwise expire.

a de novo determination by the district judge and/or waive the right to appeal.

_Logue must immediately advise the Court of any change in his mailing_ _address._  Failure to do so may result in dismissal of this action without notice to him.

DATED this 11th day of June, 2020.

_/s/ John Johnston_____
John Johnston
United States Magistrate Judge